**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| BOARD AMERICAS, INC. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| ) | Civil Action No. 1:22-CV-10595-AK |
| v. ) | |
| ) | |
| SALLY BEAUTY HOLDINGS, INC., ) | |
| and JAY DeBLANK ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON MOTION TO DISMISS FOR LACK OF**
**JURISDICTION BY JAY DEBLANK AND MOTION TO DISMISS BY SALLY BEAUTY**
**HOLDINGS, INC.**

**A. KELLEY, D.J.**

Board Americas, Inc ("Board") brings this lawsuit against defendants Sally Holdings

Inc.("Sally")[1] and Jay DeBlank ("DeBlank").  Board seeks damages against the defendants for

their breach of a Software-as-a-Service Agreement ("SaaS Agreement") for which they assert

Sally owes $679,200 for the license to use Board's software and support services for a minimum

of the next two years.  Board asserts claims for breach of contract, quantum meruit, and violation

of Mass. Gen. Laws Chapter 93A, Section 11.  Defendants maintain that the SaaS agreement was

merely a failed negotiation that never represented a final agreement.

---

[1] Board filed its lawsuit against Sally Beauty Holdings, Inc. which is a corporate affiliate of Sally Holdings LLC.
[Dkt. 9 at 1 n.1].

1

DeBlank has filed a motion to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. [Dkt. 8].  Sally has filed a partial motion to dismiss with respect to Board's Chapter 93A claim.[2] [Dkt. 6].

For the following reasons, DeBlank's motion to dismiss for lack of personal jurisdiction [Dkt. 8] is **DENIED**.  Sally and DeBlank's partial motion to dismiss as to Board's Chapter 93A claim [Dkt. 6] is **GRANTED.**

## I.      BACKGROUND

On or around July 2021, Board and Sally began discussions about an agreement in which Board would provide its software to help improve Sally's supply chain analytics.  [Dkt. 1 ("Compl.") at ¶¶ 10].  Between July and October 2021, DeBlank, Sally's Director of Supply Chain Analytics, began negotiating the scope and terms of the SaaS agreement on Sally's behalf.  [Id. at ¶¶ 11-12].  Board is a Massachusetts corporation with its principal place of business in Boston.  DeBlank resides in Dallas, Texas.  [Id. at ¶¶ 3].  Board does not allege that they met with DeBlank in-person, but rather that they negotiated over "numerous meetings, telephone calls, and emails."  [Id. at ¶ 12].  DeBlank told Board that he was in "constant communication" with Sally's Vice President and Head of Logistics, with Sally's legal and IT departments, and he

---

[2] Defendant DeBlank joins the partial motion to dismiss subject to the outcome of his own motion to dismiss for lack of personal jurisdiction.  [Dkt. 6 at 1 n.1].

would provide Board updates from them during the negotiations.  [Id. at ¶ 14].  DeBlank

represented to Board that he was expressly authorized to execute the SaaS agreement.

[Id. at ¶¶ 15-16].

On or around October 5, 2021, Board and Sally entered into the SaaS agreement which

DeBlank executed on Sally's behalf.  [Id. at ¶¶ 18].  The agreement was accompanied by an

Order Form which detailed the software ordered and was signed by DeBlank on behalf of Sally.

[Id.; Dkt. 1-1].  The SaaS agreement and the service level agreement also are signed by DeBlank.

[Dkt. 1-1 at 11; Dkt. 1-2 at 9].  The opening paragraph of the SaaS agreement and the service

level agreement outlined the parties in the transaction as well as their respective addresses,

including Board's address in Boston, Massachusetts.  [Dkt. 1-1 at 1; 1-2 at 2].  The signed

agreement in both the SaaS agreement and the service level agreement includes a governing law

section which states that any disputes arising from the contract will be governed by the laws of

Massachusetts and that the courts in Boston shall have exclusive jurisdiction to adjudicate any

disputes.  [Dkt. 1-1 at 10; 1-2 at 8].

According to the SaaS agreement, Board made its software available to Sally for

$226,400 per year for a three-year term.  [Compl. at ¶¶ 20].  Around the same time, Board and

Sally entered into a service agreement, providing Sally with its "Gold" level support package for

software.  [Id. at ¶ 23].  The SaaS agreement provided that Board's support services could be

purchased separately; the two parties engaged in discussions for an addendum to the SaaS and

including discussing the possibility of having a third-party implement Board's software.  [Id. at ¶

25].

After the agreements were executed, the parties continued having meetings and phone

calls about onboarding the software including to discuss "kickoff strategy." [Id. at ¶ 30].  On

October 15, 2021, Board began issuing invoices which according to their agreement Sally was obligated to pay within thirty days. [Id. at ¶ 26-27]. Sally declined to do so. [Id. at ¶ 28]. On November 10, 2021, DeBlank informed Board that Sally's Supply Chain Group had missed its budget target for the year and thus was coming under pressure from its new Chief Executive Officer.

[Id. at ¶¶ 31-32].

On January 23, 2022, citing pressure from his superiors in the company, DeBlank emailed Board asking if any alterations to the agreement could be made. [Id. at ¶ 33]. Board responded offering to split the past-due payments into three parts and to extend the term of the SaaS agreement for an additional three months without charge. [Id. at ¶¶ 35].

On January 27, 2022, Board received a response from Sally's Senior Counsel, Amy Dungan, that stated the following:

> "I'll be your point of contact moving forward. We are not moving forward with the Agreement we were in the process of negotiating. To be clear, we do not have a contract with you, we never reached an agreement, there are no payments due, nor is there any interest obligation as your email states."

[Id. at ¶ 36]. Board responded with a letter of dispute. [Id. at ¶ 38]. Ms. Dungan further followed up reaffirming the lack of agreement and stating that DeBlank did not have the authority to execute the contracts.

On April 5, 2022, Sally filed a complaint in the United States District Court for the Eastern District of Texas seeking a declaratory judgment regarding the enforceability of the agreements. [Id. at ¶ 42]. In that complaint, Sally concedes that DeBlank signed those agreements but says that he did so to "lock-in-pricing." [Id. at 44]. Board has not asserted in its

Complaint that Sally ever accessed any of Board's software or licenses or that Board provided any services to Sally.

## II.    LEGAL STANDARD

A Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction challenges the ability of the court to assert judicial power over the defendant.  When personal jurisdiction is contested, the plaintiff has the "ultimate burden of showing by a preponderance of the evidence that jurisdiction exists." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 257 (1st Cir. 2022), quoting Adams v. Adams, 601 F.3d 1, 4 (1st Cir. 2010).  To demonstrate this, the plaintiff should "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016).  The court shall review the pleadings, supplemental filings in the record, undisputed facts provided by the defendant, and then give credence to plaintiff's version of genuinely contested facts.  Id.  The burden of proof is "light" but nevertheless requires plaintiff to rely not on "mere allegations" alone but to point to specific facts in the record that support their claims. Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 8 (1st Cir. 2002) (citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements.  Id.  Factual allegations must be

accepted as true, while legal conclusions are not entitled to credit.  Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).

## III.   DISCUSSION

### A.      Personal Jurisdiction over DeBlank

DeBlank argues that Massachusetts cannot assert personal jurisdiction over him because he has not had any contacts with Massachusetts, that his actions negotiating the deal took place in Texas, and that he negotiated with other Texas-based Board employees. [Dkt. 8 at 2].  Board responds that DeBlank's contacts with Massachusetts are sufficient to authorize personal jurisdiction because he communicated regularly with Board employees in Massachusetts, he knew he was communicating with agents and employees of a Massachusetts company even when in Texas, and that he caused tortious injury to Board in Massachusetts. [Dkt. 11 at 2-3].

To establish personal jurisdiction over a nonresident defendant in a diversity case, the plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment.  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014).  Massachusetts' long-arm statute identifies causing tortious injury by act or omission in the Commonwealth, which Board alleges DeBlank has done here, as a sufficient

rationale for extending personal jurisdiction over a defendant. Mass. Gen. Laws ch. 223A, § 3. The long-arm statute is coextensive to the limits required by due process under the Constitution. Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) ("In Massachusetts, the Court can 'sidestep the statutory inquiry and proceed directly to the constitutional analysis'") (internal citations omitted).

To meet the requirements of the Due Process Clause of the Fourteenth Amendment, the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citations omitted). The First Circuit separates analysis of minimum contacts into the three categories of relatedness, purposeful availment, and reasonableness. Adelson, 510 F.3d at 49.

1. **Relatedness**

Relatedness requires that the claim "directly arise out of or relate to the defendant's forum-state activities." Vapotherm, 38 F.4th 252, 258 (citations omitted). If the claim concerns a breach of contract, relatedness hinges on "whether the defendant's activity in the forum-state was 'instrumental either in the formation of the contract or its breach.'" Adelson, 510 F.3d at 49 (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)).

Here, Board can demonstrate that DeBlank's contacts with Massachusetts are related to his forum contacts. Since the Court must give credence to plaintiff's version of genuinely contested facts, it must assume at this stage that DeBlank negotiated consistently with Board's staff in Massachusetts including its Vice President and its legal and IT departments, that he sent communications via email, telephone and video conference to Board leadership in Massachusetts, and that these communications included misrepresentations to Board about

DeBlank's authority to execute the SaaS Agreement. [Compl. at ¶¶ 12-16, 23, 30-35, 61-64, 66-68; Dkt. 11-1 at ¶¶ 6-19; 27]. That some of these communications may have been made to Board staff outside of Massachusetts, including in Texas, does not alter this analysis because Board has sufficiently related their claims to the actions taken by DeBlank towards the Massachusetts-based company he was dealing with.

Sally's reliance on Phillips Exeter to support their claim here is misplaced because, unlike Phillips Exeter, Board's claims here are more directly related to DeBlank's alleged contacts with Massachusetts. See 196 F.3d at 289-90. In Phillips Exeter, the defendant had numerous contacts with the forum through sending letters, sending checks once a year, and visiting on one occasion, but these were not sufficient for a finding of relatedness because there was no causal connection between those contacts and the contract or tort claims that gave rise to the legal dispute. Id. at 289-90. Here, DeBlank's contacts with Massachusetts may be less extensive, but they are also more closely related to the ensuing controversy. Board alleges that from the beginning of their negotiations, DeBlank was knowingly making false representations to the Massachusetts-based party he was negotiating with. [Compl. at ¶¶ 11-15, 61-64, 66-68]. Board further alleges that were it not for the representations DeBlank made, which were communicated to them in numerous meetings, phone calls, and emails, that they would not have entered into the SaaS agreement. [Compl. at ¶¶ 12, 63, 67]. The actions of DeBlank that were directed towards Massachusetts are therefore sufficiently related to his actions that gave rise to this legal dispute.

### 2.    Purposeful Availment

Purposeful availment examines whether a defendant's in-state contacts represent a "purposeful availment of the privilege of conducting activities in the forum state, thereby

invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Daynard, 290 F.3d at 61 (quoting Foster–Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144 (1st Cir.1995)).  To meet this criteria, the defendant's contacts with the forum must be able to demonstrate voluntariness and foreseeability.  Vapotherm, 38 F.4th 252, 261.  For voluntariness, those contacts "must be voluntary and not based on the unilateral actions of another party." Id. at 261-62 (quoting Adelson, 510 F.3d at 50).  Foreseeability looks at whether defendant's contacts in the forum state provides him notice to "reasonably anticipate being haled into court there." Id. (quoting World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Here, DeBlank's actions as alleged are sufficient to demonstrate purposeful availment. DeBlank is alleged to have made misrepresentations when communicating with Board employees in Massachusetts and Board's agents outside of Massachusetts, with the primary impact of both being felt in Massachusetts.  [Compl. at ¶ 1, 11-16, 61-64, 66-68; Dkt. 11-1 at ¶¶ 2-11].  Board asserts that DeBlank's communications with their employees and agents were constant and over numerous meetings, calls, and emails.  [Compl. at ¶¶ 12].   These "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" indicate that DeBlank "purposefully established 'minimum contacts'" with the forum.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479-80, 487 (1985) (purposeful availment found despite lack of physical ties to forum because dispute "grew directly out of 'a contract which had a substantial connection with that State'" and evidence in the record indicating that defendant knew he might become subject to a suit in that forum.) (citations omitted).

The SaaS agreement also weighs in favor of the Court's finding that DeBlank's participation in a Massachusetts-based lawsuit was foreseeable.  Board alleges that the SaaS agreement was a complete and final contract that Sally breached.  [Compl. at ¶¶ 21, 46-48].  Board's status as a Boston-based company is made clear in the very first line on the very first page of the agreement which bears DeBlank's signature.  [Dkt. 1-1 at 1].  Both the SaaS agreement and its accompanying service level agreement feature forum selection clauses which state that any dispute shall be governed by Massachusetts law and that courts in Boston have exclusive jurisdiction to settle any disputes or claims that may arise.  [Dkt. 1-1 at 10, 1-2 at 8].  Even without applying this clause, its presence in the agreement makes clear that DeBlank was on notice of potentially having to litigate any dispute related to the agreement in Massachusetts.[3]

The Vapotherm and Levin v. Harned, 304 F. Supp. 2d 136, 141, 159 (D. Mass. 2003) (adopting report and recommendation of magistrate judge on lack of personal jurisdiction) decisions the parties cite in regards to purposeful availment are distinguishable from these facts. [Dkt. 9 at 10-11; Dkt. 17 at 4, 6-7].  In Vapotherm, the First Circuit found that a Georgia-based employee, Clayton Santiago, did not purposefully avail himself in New Hampshire despite working for a New Hampshire-based employer and selling a product manufactured in New Hampshire. 38 F.4th at 256.  The court noted that Santiago was recruited to that employer instead of seeking out employment with them directly, that he was not interviewed for the job in New Hampshire, that he contacted staff in the state only for technical and customer support, and that his travel there was only for company-wide corporate events.  Id. at 262.  The court was

---

[3] The forum selection clause and governing law provisions are removed in the edited agreement that Sally officials send back to Board on November 9, 2021.  [Dkt. 9-1 at 17, 29].  They are relevant to the Court's analysis here for the purposes of evaluating personal jurisdiction, the Court at this stage must give credence to Plaintiff's assertions that DeBlank's agreed to the earlier contract and misrepresented his power to do so.

persuaded by Santiago's assertion that "99-plus percent" of the focus of his work was regarding accounts in Florida and Georgia.  Id.

While DeBlank may have had fewer contacts with Massachusetts than Santiago, the nature of his contacts made his presence in the forum more foreseeable.  He took part in extended negotiations and allegedly came to an agreement with members of Board in Massachusetts.  [Compl. at ¶¶ 12-15].  Unlike Vapotherm, wherein the alleged breach of contract occurred outside of the forum and after Santiago had left the company, Board here alleges that DeBlank from the beginning of their contacts was intentionally sending false communications to Massachusetts.  38 F.4th at 255-56, [Compl. at ¶¶ 12-15, 61-64, 66-68].  A governing law clause was also present in the relevant contracts in Vapotherm, but, unlike here, the Vapotherm contract identified another state's law as governing—not the law of the forum state.  38 F.4th at 262, ("Santiago's own employment contract had a choice-of-law clause for Maryland, further indicating a lack of notice that he would be haled into New Hampshire to defend himself.").

Unlike here, in Levin, which DeBlank seeks to rely on, the defendant Newel Art Gallaries ("Newel") entered a commercial transaction unaware that the purchaser was from Massachusetts.  Levin, 304 F. Supp. 2d at 141, 159.  Here, Plaintiff has alleged sufficient facts to demonstrate that DeBlank was aware of their Massachusetts connection.  Unlike the dispute here, in Levin, there was also no contract present or correspondence sent by Newel to the Massachusetts-based plaintiff.  Id. at 170.

3.    **Reasonableness**

The last requirement is that the exercise of jurisdiction over a defendant be fair and reasonable.  Vapotherm, 38 F.4th at 262.  The First Circuit evaluates reasonableness by applying the "Gestalt" factors which evaluate:

> "(1) the defendants' burden of appearing in the forum state, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies."

Cossart v. United Excel Corp., 804 F.3d 13, 22 (1st Cir. 2015) (quoting C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 69 (1st Cir. 2014)).

Exercising jurisdiction over DeBlank here is both fair and reasonable. DeBlank makes no specific claims about being burdened by appearing in Massachusetts. [See Dkts. 9, 17]. The state of Massachusetts has an interest in providing a forum for its corporations and residents "when their commercial contracts are said to be breached by out-of-state defendants." C.W. Downer, 771 F.3d at 70, see also Burger King Corp. v. Rudzewicz, 471 U.S. at 474, (forum state has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.") (citation and internal quotation marks omitted). Finally, exercising jurisdiction here is preferable as Sally is already part of this litigation and the presence of the other defendant, DeBlank, will prevent delay and aid the efficient administration of this case. See Daynard, 290 F.3d at 62-63 (administration of justice aided because proceedings were already ongoing against other defendants).

DeBlank's motion to dismiss for lack of personal jurisdiction [Dkt. 8] is therefore **DENIED.**

## B.      Chapter 93A Claim

Sally argues that Board has failed to state a Chapter 93A claim, in part, because Board's allegations amount to nothing more than a breach of contract. [Dkt. 7 at 4]. Board responds by asserting that Sally engaged in an unfair and deceptive act by breaching its contract to secure a benefit it was not entitled to, namely the early termination of the deal. [Dkt. 10 at 7].

Chapter 93A creates a cause of action for anyone who suffers an economic loss while engaging in trade or commerce because of another person using an "unfair method of competition or an unfair or deceptive act." Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 313 (1st Cir. 2022) (quoting Mass. Gen. Laws ch. 93A, § 11). A breach of contract alone is not sufficient to establish a claim under Chapter 93A. Secure Our City, Inc. v. ECI Sys., LLC, 594 F. Supp. 3d 96, 105 (D. Mass. 2022). However, a party knowingly violating its contractual agreements in order to secure an unwarranted benefit for themselves does constitute a violation of Chapter 93A. Formulatrix, Inc. v. Rigaku Automation, Inc., 344 F. Supp. 3d 410, 430 (D. Mass. 2018). The party alleging the breach must demonstrate "the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party." Secure Our City, 594 F. Supp. 3d at 105, (evidence of nonpayment, without economic coercion, was not enough to demonstrate an unfair or deceptive business practice) (citations omitted).

Board fails to state a claim for a violation of Chapter 93A because the conduct they accuse Sally of lacked the "extortionate quality" necessary for a breach of contract to rise to the requisite level. See Id. Board's allegations are that Sally falsely took the position that the agreements were not final and that DeBlank did not have authority to negotiate the agreements. [Compl. at ¶¶ 56]. They characterize terminating the contract early and forcing Board to disregard its entitlement to the agreed upon compensation under the SaaS Agreement as the benefit Sally sought to leverage from this breach. [Id., Dkt. 10 at 7]. That description though is *indistinguishable* from an ordinary breach of contract. Board does not provide factual allegations that would give rise to a plausible claim that Sally's actions coupled the breach of their duties with economic coercion or that Sally breached their contract in order to force additional concessions from Board. [Compl. at ¶¶ 18-44, 56-59]; compare Com. Union Ins. Co.

v. Seven Provinces Ins. Co., Ltd., 9 F. Supp. 2d 49, 69 (D. Mass. 1998) (reinsurer refused to pay

for a valid claim in order to force plaintiff renegotiate a lower amount); Anthony's Pier Four, Inc.

v. HBC Assocs., 583 N.E.2d 806, 820-22 (Mass. 1991) (Chapter 93A violation where owner

withheld approval of plan to force developer to increase compensation beyond the contract's

requirements). Their allegations instead contend that Sally disputed that the agreement had been

made and sought to continue negotiations.

[Compl. at ¶¶ 31-44].

   Several of the remaining authorities that Board relies on diverge from the facts in this

case because they feature instances in which the party purposefully either entered into or

breached the contract in order to further enrich itself.  [Dkt. 10 at 8]; See Arthur D. Little, Inc. v.

Dooyang Corp., 147 F.3d 47, 54-55 (1st Cir. 1998) (defendant did not intend to pay plaintiff for

the work it performed); Cm.y Builders, Inc. v. Indian Motorcycle Associates, Inc., 692 N.E.2d

964, 978 (Mass. App. 1998) (defendant forced plaintiff to perform services while planning to

withhold payments in order to coerce plaintiff to accept less than the agreed upon compensation);

Com. Union Ins., 9 F. Supp. 2d at 69 (reinsurer refused to pay for a valid claim in order to force

plaintiff to renegotiate a lower amount); Aware, Inc. v. Centillium Commc'ns, Inc., 604 F. Supp.

2d 306, 312 (D. Mass. 2009) (defendant reaped the benefits from the agreement while avoiding

most of its obligations).

   The facts of the breach of contract here do not indicate that defendant retained the

benefits of the contract without paying for its benefits.  Here, Board does not allege that Sally

ever used or accessed the software it provided them.  See [Compl. at ¶¶ 18-44, 56-59].

   The fact that Sally may have repudiated the agreements it made in bad faith is still not

sufficient to establish a Chapter 93A claim without more allegations.  [Dkt. 10 at 9].  The

authority that Board cites to support its claim diverges from the facts here because there, the breach of contract and bad faith action were taken to provide the breaching party an unearned benefit—no such unearned benefit, beyond the breach itself, is alleged here. See New Kappa City Const. v. National Floors Direct Inc., 2011 WL 5082138 at *1, 3 (Mass. App. Div. 2011) (denial of payment for completed floor work because of unsubstantiated claims that the work was substandard quality sufficient to establish Chapter 93A violation); Adams v. Delleville, 2010 WL 2008916, at *1 (Mass. App. Ct. 2010) (Chapter 93A violation where defendant held on to both the plaintiff's deposit and the at-issue alcoholic beverages license without justification in violation of previous agreement).

Board alternatively highlights Sally's assertion that DeBlank agreed to the SaaS agreement to "lock-in pricing." [Id. at ¶ 44]. They characterize this as a "guise" to make it seem like they would perform while continuing to negotiate the terms of software implementation. [Dkt. 10 at 9]. They assert that when those negotiations broke down, Sally began to deny the prior deal was made. [Id.; Compl. at ¶¶ 36-44]. This aspect is not sufficient to establish a Chapter 93A claim either because it still essentially describes a breach of contract claim. Board does not assert that Sally breached its duties in order to improve its leverage in subsequent negotiations about software implementation. They only claim that Sally refused to abide by obligations they had previously made in regard to the SaaS agreement. This allegation therefore lacks the use of a breach as a "lever to obtain advantage" that is required to support a Chapter 93A claim. See Secure Our City, 594 F. Supp. 3d at 105 (citation omitted).

Board cites two cases to support its claim that Sally's "lock in" pricing strategy can establish a Chapter 93A claim. [Dkt. 10 at 9]. Yet neither of those cases are apposite to these facts. See Ecological Fibers, Inc. v. Kappa Graphic Bd., B.V., 345 F. Supp. 2d 13, 15 (D. Mass.

2004) (defendant fraudulently entered contract for "the purpose of contacting and soliciting" plaintiff's customers"); Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc., 2014 WL 1203106, at *7 (D. Mass. 2014) (defendant intentionally breached its agreement to deprive plaintiff payment of commissions owed).  There are no allegations here that Sally's entered this contract for a deceptive purpose or that the premature breach of its duties was intended to give itself any specific financial or strategic benefit.

## IV.    CONCLUSION

For the foregoing reasons, DeBlank's motion to dismiss for lack of personal jurisdiction [Dkt. 8] is **DENIED**.  Sally's partial motion to dismiss as to Board's Chapter 93A claim [Dkt. 6] is **GRANTED**.

**SO ORDERED.**

Dated: February 27, 2023                      /s/ Angel Kelley
                                              Hon. Angel Kelley
                                              United States District Judge

16